**ELBAR, INC. and Jasper Bullock, Appellants,**

v.

**William D. CLAUSSEN and Wanda Claussen, Appellees.**

**No. 05–88–00058–CV.**

Court of Appeals of Texas, Dallas.

June 16, 1989.

Rehearing Denied July 24, 1989.

Sidney H. Davis, Jr., Robert G. Hogue, Dallas, for appellants.

Bruce A. Pauley, Ted B. Lyon, Jr., Robert Charles Lyon, Rowlett, for appellees.

Before STEWART, ROWE and OVARD, JJ.

OVARD, Justice.

Elbar, Inc. and Jasper Bullock appeal from a final judgment awarding actual and punitive damages to appellees William D. and Wanda Claussen for the death of their son, William Dean Claussen. Appellants will be referred to collectively as "Elbar."

The Claussen's son, William Dean, was killed in a highway accident involving a tractor-trailer truck driven by Bullock. Bullock, an employee of Elbar, was returning from a five-day trip when the truck he was driving entered William Dean's lane. This caused William Dean to lose control of his motorcycle and resulted in his death.

In twelve points of error, Elbar complains of the following: (1) there was no evidence to support the submission of or the jury's affirmative answer to the special issues concerning gross negligence and proximate cause; (2) there was insufficient evidence to support the jury's findings of gross negligence and proximate cause and the trial court, therefore, erred in overruling Elbar's motion for new trial; (3) Elbar's compliance with Department of Transportation regulations precluded a finding of gross negligence as a matter of law; (4) as surviving parents, the Claussens were not entitled to recover exemplary damages under the wrongful death act; (5) the award of exemplary damages was grossly excessive and was not supported by the pleadings; (6) the exemplary damage recovery should be reduced by the percentage of negligence attributed to William Dean Claussen; (7) the trial court erred in refusing Elbar's request to invoke the witness rule; and (8) the trial court erred in failing to accept the verdict as initially returned by the jury and in instructing the jury to answer special issue no. 3. For the reasons discussed below, we affirm the trial court judgment.

## GROSS NEGLIGENCE

Elbar argues that there was no evidence to support the submission of a special issue concerning whether Elbar's acts or omissions constituted gross negligence. Elbar also argues that there was no evidence or insufficient evidence to support the jury's finding that Elbar's acts or omissions constituted gross negligence.

In determining a "no evidence" point of error, we consider only that evidence and the reasonable inferences therefrom, which viewed in its most favorable light, supports the jury's finding and we reject all evidence and reasonable inferences to the contrary. *Glover v. Texas Gen. Indem. Co.*, 619

S.W.2d 400, 401 (Tex.1981). When submitting a case on special issues, questions raised by the pleadings and by the evidence must be submitted to the jury. TEX.R. CIV.P. 278.

■ The same "no evidence" test applies to a jury finding of gross negligence as applies to any other fact issue. Once the jury finds gross negligence, the defendant must establish that there was no evidence to support that determination. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920–21 (Tex.1981). Gross negligence is defined as an "entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *Williams v. Steves Indus. Inc.*, 699 S.W.2d 570, 572 (Tex.1985); *Burk Royalty Co. v. Walls*, 616 S.W.2d at 920. Conscious indifference must be viewed from the vantage of all the surrounding facts, circumstances, and conditions. A defendant's mental state may be inferred from circumstances which would indicate to a reasonable person that his conduct created an extreme risk to the safety of others. *See Williams v. Steves Indus. Inc.*, 699 S.W.2d at 573.

Bullock was employed as a truck driver by Elbar, Inc., a trucking firm which was under contract to deliver mail for the United States Postal Service. Elbar had eight long-haul-routes, most of which operated continuously, every day of the year. For the last three months, Bullock was assigned to a route which began in El Paso, took him to Los Angeles, back to El Paso, then to Greensboro, North Carolina, and finally back to El Paso. Each of these trips lasted five days with a two-day respite between trips.

Elbar used the "sleeper-driver" manner of operation. The Department of Transportation (D.O.T.) regulations which govern the hours of sleep required for long haul truckers provide that a driver may drive only ten hours following eight consecutive hours off duty. However, drivers using sleeper berth equipment may cumulate the required eight consecutive off duty hours by resting in the sleeper berth for two separate periods totaling eight hours, neither of which can be less than two hours. No driver may be on duty more than sixty hours in any seven consecutive days or seventy hours in any eight consecutive days. 49 C.F.R. § 395.3. Using this method, two drivers may travel for days taking breaks to refuel, eat, shower, and unload cargo. One person is allowed to sleep in the berth while the other person continues driving.

Etta Jane Ingersoll, Bullock's co-driver, left with Bullock on November 30 within thirty minutes of having returned from another trip and, at the time of the accident, was experiencing her tenth consecutive day on the road. The accident occurred near Dallas as the Elbar truck was returning from Greensboro, North Carolina. William Dean Claussen attempted to pass the Elbar truck when Bullock, who was driving, entered the lane occupied by Claussen. In attempting to avoid a collision with the truck, Claussen lost control of his motorcycle and was crushed beneath the wheels of the tractor-trailer truck.

The Claussens' claim that Elbar was grossly negligent was based on the theory that the sleeper-driver method employed by Elbar was inherently dangerous. That is, keeping drivers on the road for extended periods of time causes driver fatigue which leads to an extreme risk to the safety of others.

■ John Neal, a World War II squadron truck commander and safety director for two national trucking companies, testified as the Claussens' expert. During his fourteen years with trucking companies, Neal had analyzed approximately one thousand serious accidents. His testimony was based upon numerous nationally recognized studies which reveal that fatigue is the most prevalent cause of serious truck accidents, accounting for forty to forty-two percent of them. Neal testified that the trucking industry has known about the fatigue problem for years. Neal analyzed the accident in question and after reviewing all the documents, reports, statements, and depositions concerning the accident, expressed his opinion that fatigue was a sub-

stantial contributing factor in this accident. Neal stated that the method employed by Elbar (requiring its drivers to operate their trucks for long, continuous periods of time) lends itself to fatigue, is not a safe and prudent operation, and presents a serious safety problem to the average motorist. This testimony provided some evidence upon which the jury could have found Elbar guilty of gross negligence.

With respect to the sufficiency of the evidence to support the jury's finding that Elbar was grossly negligent, we now consider all of the evidence to determine whether the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). In addition to the aforementioned, the jury also heard the following evidence:

—most fatigue-related accidents occur during the return leg of a trip;

—the minimum that the federal government recommends for driver training is eight weeks, whereas Elbar's one week of instruction is grossly inadequate;

—drivers who have not been taught proper techniques may go for years without a problem, but bad techniques may evidence themselves years down the line;

—Bullock was not properly qualified when Elbar put him on the road following only one week of training;

—Elbar's drivers do not receive adequate rest between driving runs;

—the sleeper-driver method is not the method practiced by most of the trucking industry;

—neither Ingersoll nor Bullock's driving logs, which by federal regulation must account for every minute on the road, were in compliance with D.O.T. requirements;

—Ingersoll's driving logs showed that Elbar allowed her to drive for periods of time which violated D.O.T. regulations;

—drivers using the sleeper-driver operation show earlier and/or greater signs of fatigue and performance degradation that those who practice the relay driving method;[1]

—studies have found significant decreases in driver alertness and increases in errors due to fatigue which were evidenced well within the driving limits allowed by D.O.T.;

—it is very difficult to acquire adequate rest on the road because of noise, vibration, movement, climate control, and light;

—Elbar's General Manager, who was responsible for safety, was unaware of any studies or statistics regarding truck driver fatigue;

—Elbar had done no independent studies on fatigue;

—the problem of fatigue has been well known in the trucking industry for years and D.O.T. studies were made available to all trucking organizations;

—Elbar's method of operation, which requires its drivers to operate their trucks for long, continuous periods of time, amounts to conscious indifference to safe industry standards;

—Elbar's method of operation, which requires its drivers to operate their trucks for long, continuous periods of time, subjects the average motorist to serious danger;

—knowing that your team driver is fatigued would affect your ability to rest.

In Elbar's favor, the jury heard the following evidence: with regard to the trip in question, Bullock was driving within the allowable time provided for by D.O.T. safety regulations; Elbar's operating procedures were within D.O.T. regulations with respect to its long haul operations; Elbar's policy was to fire an employee driver for a single speeding ticket or for a single accident in which the driver was at fault; El-

---

1. The relay system uses one driver who delivers a truck to a destination where a different driver continues to the next destination. Following a run, relay drivers sleep in a bed, rather than in their vehicles.

bar's trucks were altered so they could not be driven in excess of fifty-eight miles per hour; Elbar's safety record was three times better than that of the trucking industry as a whole; the company offered annual driver education programs; Bullock testified he was not fatigued at the time of the accident; D.O.T. regulations allow the sleeper-berth operation utilized by Elbar; and Bullock had a good safety record while employed with Elbar.

As fact finders, it was within the jury's province to weigh the evidence and to accept or to reject it as they thought proper. *See Anderson v. Trent*, 685 S.W.2d 712, 713 (Tex.App.—Dallas 1984, writ ref'd n.r.e). It is clear that the special issue questioning Elbar's gross negligence was raised by the evidence. We further hold that weighing all the evidence, favorable and unfavorable, the jury had sufficient evidence upon which to find Elbar guilty of gross negligence. While a different jury might have reached a different conclusion, we may not substitute our judgment for that of the jury. *Anderson v. Trent*, 685 S.W.2d at 713.

## PROXIMATE CAUSE

Elbar contends that there was no evidence to support submitting a special issue on proximate cause regarding Elbar's gross negligence. Elbar also argues that there was no evidence or insufficient evidence to support the jury's finding that Elbar's gross negligence was the proximate cause of the accident. Proximate cause is composed of cause in fact and foreseeability. *Nixon v. Mr. Property Management Co. Inc.*, 690 S.W.2d 546, 549 (Tex.1985).

In meeting the first element, the Claussens were required to prove that "but for" Elbar's acts or omissions, the accident would not have occurred. *Williams v. Steves Indus. Inc.*, at 575. Bullock's negligence in causing the accident is not challenged by Elbar. Testimony from eye witnesses was that at the time of the accident, Bullock changed lanes rapidly and admitted that he did not see the motorcyclist prior to changing lanes. Neal testified that Bullock failed to use proper viewing techniques to determine if the lane was clear. There was evidence that mid-afternoon, when this accident occurred, is a critical time period as relates to driver fatigue. There was also testimony that, just prior to the time of the accident, Bullock attempted to change lanes and nearly collided with a Ford Bronco which was then occupying the lane.

Additional evidence was that studies have found significant decreases in driver alertness well within the time limits of federal regulations. Even Bullock acknowledged significant fatigue could occur within D.O.T. regulation times. Accumulative fatigue appears after four days on duty and the adverse effects of prolonged driving are more pronounced among drivers over age forty-four. Bullock was fifty years old and had been on the road approximately 108 hours when the accident occurred. Accumulative fatigue means that even after a driver has rested, he continues to feel tired. Additionally, drivers such as Bullock who are on a regular schedule experience more fatigue than drivers who are on an irregular schedule. Further, sleeper-drivers show less recovery from corresponding breaks than relay drivers. Successive runs cause a greater than normal onset of physiological decline in sleeper drivers. Neal testified that fatigue was a substantial contributing factor in this accident.

We hold that there was sufficient evidence for the jury to have concluded that Bullock was fatigued at the time of the accident. There was also sufficient evidence for the jury to find that Elbar's decision to operate in the sleeper-driver method, under which its drivers were required to operate their vehicles for long periods of time without adequate rest, brought about the accident.

Secondly, the Claussens had to establish the element of foreseeability, that is, whether Elbar, using ordinary intelligence, should have foreseen the danger its negligent conduct created.

[I]t is not required that the particular accident complained of should have been

foreseen. All that is required is that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.

*Carey v. Pure Distrib. Corp.*, 133 Tex. 31, 35, 124 S.W.2d 847, 849 (1939). *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex.1987); *City of Gladewater v. Pike*, 727 S.W.2d 514, 517 (Tex.1987). The jury heard testimony that Elbar's method of operation was neither safe nor prudent and that the fatigue factor was common knowledge in the industry. Neal testified that numerous studies have shown that it is much more difficult to maintain a safe trucking operation by using the sleeper-driver concept. Under the evidence, we conclude that the jury could have found that Elbar employed a method which lent itself to fatigue and could, or should, have reasonably foreseen an accident of this character. The claim that the trial court erred in overruling its motion for new trial, which was based on the insufficiency of the evidence to support proximate cause, likewise, fails.

Based on the aforementioned, we hold that submitting the special issue on proximate cause was supported by the evidence and that the evidence was sufficient to sustain a finding of gross negligence.

## D.O.T. COMPLIANCE

■ Elbar argues that because it was in compliance with D.O.T. regulations, a finding of gross negligence against it was precluded as a matter of law.[2] We disagree. While Elbar maintained at trial that its drivers operated within D.O.T. requirements, there was also evidence that neither Bullock's nor Ingersoll's driving logs were in compliance with federal regulations and that such inaccuracies made auditing difficult. Additionally, during trial, Elbar's General Manager admitted that Ingersoll

was grossly out of compliance with federal regulations and should not have accompanied Bullock on the trip in question. Elbar's claim to be in compliance with federal regulations may constitute evidence that it exercised "some care" in its operations; however, the jury was entitled to determine what weight to accord that evidence. *See Burk Royalty Co. v. Walls*, 616 S.W.2d at 921.

## THE RULE

Elbar next argues the court erred in refusing its request to exclude witnesses from the courtroom during the trial. TEX. R.CIV.EVID. 614. During the early stages of the trial, but after testimony had begun, Elbar sought to invoke "the rule." This request was denied. Elbar argues that it was prejudiced by the court's denial because a witness for the Claussens, accident investigator Rudd, gave trial testimony which differed from the testimony he had given in his deposition.

Rule 614 of the Texas Rules of Civil Evidence, commonly referred to as "the rule," provides for the exclusion of witnesses from the courtroom so that they cannot hear and be influenced by the testimony of other witnesses. Prior to the adoption of the rules of evidence, the exclusion of witnesses was discretionary with the trial court, but under the wording of the new rule, the court must exclude witnesses upon the request of a party. *See* S. GOODE, O. WELLBORN & M. SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 614.1 (Texas Practice 1988); *compare Triton Oil & Gas Corp. v. E.W. Moran Drilling Co.*, 509 S.W.2d 678, 684 (Tex.Civ.App.—Fort Worth 1974, writ ref'd n.r.e.) (rule is discretionary, not mandatory) *and Medrano v. City of El Paso*, 231 S.W.2d 514, 517 (Tex. Civ.App.—El Paso 1950, writ ref'd n.r.e.) (rule is directory, not mandatory) *with* TEX.R.CIV.EVID. 614 (court shall exclude witnesses) *and* TEX.R.CIV.P. 267 (witnesses shall be removed). However, three

---

**2.** Neal's testimony was that Congress has not changed the allowable hours of service because

of the economic impact.

classes of witnesses are exempt from the operation of the rule. Included among those exempt is any person whose presence is essential to the presentation of a party's cause. This exemption is typically invoked for expert witnesses. *See Triton Oil & Gas Corp. v. E.W. Moran Drilling Co.,* 509 S.W.2d at 685.

■ Rudd was named by the Claussens as an expert witness and was entitled to be present during the trial. Rudd testified that he changed his opinion about who caused the accident because of what he had learned from completing accident reconstruction school. Elbar does not argue that the failure to exclude any other witness was prejudicial. Therefore, error, if any, was harmless. TEX.R.APP.P. 81(b)(1).

## PLEADINGS

■ Elbar next argues that the Claussens did not plead that Bullock was fatigued and that the judgment was, therefore, based on theory that was not plead. While it is true that a judgment must conform to the pleadings, we disagree with the claim that the Claussens did not allege fatigue. *See* TEX.R.CIV.P. 301. The Claussens alleged that:

> Defendant, Elbar, Inc., acted with gross negligence such that Defendants [sic] actions were the result of conscious indifference to the rights, welfare and safety of the general public. More specifically, Defendants created an unreasonably dangerous condition by requiring their drivers to work an excessive amount of hours which caused *extreme fatigue;* thereby creating an unreasonably dangerous condition on the roads and highways traveled by the public. Such actions constitute gross negligence on the part of Defendant, Elbar, Inc., and were a direct and proximate result of the death of William Dean Claussen, deceased.

(Emphasis added.) This pleading was clearly sufficient to raise the issue of fatigue which we have held finds support in the evidence.

## EXEMPLARY DAMAGE AWARD

### A. Award under Wrongful Death Statute

Elbar complains that the trial court erred in awarding exemplary damages to the Claussens because, as surviving parents, they are not included among the constitutional list of those entitled to recover such damages. TEX. CONST. art. XVI, § 26. Suit was filed in the names of William D. Claussen, Wanda Claussen, and the Estate of William Dean Claussen, deceased. In its amended final judgment, the court, without explanation, ruled that "the Estate of William Dean Claussen was not a proper plaintiff before the court." It then decreed that William D. and Wanda Claussen should recover $300,000 in exemplary damages from Elbar. Elbar raises this complaint for the first time on appeal but claims that the trial court did not have jurisdiction to award exemplary damages to the parents and that this fundamental error can be argued for the first time on appeal.

■ Article XVI, section 26, of the Texas Constitution limits the right to recover exemplary damages for the wrongful death of a person to the "surviving husband, widow [and] heirs of his or her body." Thus, it has been held that surviving parents are not entitled to recover exemplary damages under the Wrongful Death Act. *See Hofer v. Lavender,* 679 S.W.2d 470, 475 (Tex.1984). *But see* TEX.R.CIV.P. 93(1), (2). However, to preserve a complaint for appellate review, a party must have presented his objection to the trial court. *See* TEX.R.APP.P. 52(a); TEX.R. CIV.P. 93(1), (2). Complaint may be had for the first time on appeal only where the fundamental error exists. Fundamental error in civil matters occurs in extremely limited circumstances, such as where the court does not have proper jurisdiction over the action. *Bantuelle v. Williams,* 667 S.W.2d 810, 813–14 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). Further, the record on its face must show the court lacked jurisdiction. *See Smiley v. Johnson,* 763 S.W.2d 1, 4 (Tex.App.—Dallas 1988, writ pending).

To determine if the trial court had jurisdiction over the controversy, we look to the allegations of the petition. *See Brannon v. Pacific Employers Ins. Co.*, 148 Tex. 289, 294, 224 S.W.2d 466, 469 (1949); *Thomas v. Whaley*, 561 S.W.2d 526, 529 (Tex.Civ.App.—Texarkana 1977, writ ref'd n.r.e.). Elbar does not argue that the petition denies the court jurisdiction and the petition does reflect subject matter jurisdiction over this controversy. *See* TEX. GOV'T CODE ANN. § 24.007 (Vernon 1988); TEX. CONST. ART. V, § 8; *Super X Drugs of Texas, Inc. v. State*, 505 S.W.2d 333, 336 (Tex.Civ.App.—Houston [14th Dist.] 1974, no writ).

The test of jurisdiction is whether a court had the power to enter upon an inquiry and not whether its conclusions are correct. *Yount v. Fagin*, 244 S.W. 1036, 1039–40 (Tex.Civ.App.—Beaumont 1922, writ dism'd). It is the power to hear and determine the general class of cases to which a proceeding belongs. *See Brown v. French*, 413 S.W.2d 924, 926–27 (Tex.Civ.App.—Amarillo), *rev'd on other grounds*, 424 S.W.2d 893 (Tex.1967). While the court may have erred in the award of exemplary damages, its jurisdictional power included the power to rule erroneously. *See Eagle Signal Corp. v. Wittig*, 766 S.W.2d 390, 392–93 (Tex.App.—Houston [1st Dist.] 1989, no writ); *McConathy v. Ken R. Davey, Inc.*, 734 S.W.2d 47, 49 (Tex.App.—Dallas 1987, writ ref'd n.r.e.).

As this complaint was not urged below, the trial court was denied the opportunity to correct its error. *See Fajkus v. First Nat'l Bank of Giddings*, 735 S.W.2d 882, 886 (Tex.App.—Austin 1987, writ denied); *Bailey v. Merrill*, 582 S.W.2d 489, 490 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.). Because Elbar failed to present its constitutional challenge to the trial court's action, we will not consider it for the first time on appeal. *Lynch v. Port of Houston Auth.*, 671 S.W.2d 954, 957 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Central Bank v. Harris*, 623 S.W.2d 807, 810 (Tex.App.—Austin 1981, no writ).

### B. Comparison of Negligence

Elbar claims that the award of exemplary damages should be reduced by the percentage of negligence which the jury attributed to William Dean Claussen. Elbar concedes that this point has been decided adversely to it in *Anderson v. Trent*, 685 S.W.2d at 714, and we decline to reconsider this decision.

The purpose of awarding exemplary damages is not to compensate the plaintiff, but to punish and set an example for others. *Anderson v. Trent*, 685 S.W.2d at 714. Therefore, exemplary damages should not be reduced proportionately to the percentage of negligence attributed to the plaintiff. *See also Hondo's Truck Stop Cafe, Inc. v. Clemmons*, 716 S.W.2d 725, 726 (Tex.App.—Corpus Christi 1986, no writ); *Olin Corp. v. Dyson*, 709 S.W.2d 251, 253–54 (Tex.App.—Houston [14th Dist.] 1986, no writ).

### C. Excessiveness of Award

Elbar contends that the jury's decision to award $300,000 in punitive damages was based on passion and prejudice. It also argues that these damages resulted in a deprivation of property without due process and constituted an excessive fine. Because the constitutional complaints were not raised below, we will not consider them for the first time on appeal. *See Lynch v. Port of Houston Auth.*, 671 S.W.2d at 957; TEX.R.APP.P. 52(a).

With respect to the claim that the award was the product of passion, rather than reason, exemplary damages must be reasonably related to the actual damages. *See Wright v. Gifford–Hill & Co. Inc.*, 725 S.W.2d 712, 714 (Tex.1987). Factors to be considered in judging this relationship include: the nature of the wrong; the character of the defendant's conduct; the degree of the defendant's culpability; the situation and sensibility of the parties; and the extent to which the conduct offends the public's sense of justice and propriety. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). When determining reasonableness, there is no fixed ratio between the amount of actu-

al and exemplary damages. Each case must be judged on its own facts. Here, the ratio of actual damages to exemplary damages is 1:3.75 or $80,000 in actual damages compared to $300,000 in exemplary damages. We cannot say that under the facts of this case the award of damages was so excessive as indicate it was based on passion or prejudice or that it otherwise shocks the conscience of the Court. *See Moore's Inc. v. Garcia,* 604 S.W.2d 261, 266 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.).

## JURY INSTRUCTION

Elbar's final complaints stem from the conditioning instruction which preceded special issue no. 3.[3]

The special issues read in pertinent part as follows:

1

Whose negligence, if any, was a proximate cause, if any, of the occurrence in question in this case?

ANSWER "Yes" or "No" as to each:    ANSWER

a) William Dean Claussen

_____

b) Defendant Bullock

_____

c) Both (a) and (b)     YES

If you have answered 'yes' to Issue No. 1(c) then answer Issue No. 2; otherwise, please do not answer Issue No. 2.

2

What percentage, if any, of the negligence that you have found in your answer to Issue No. 1(c) to have been a proximate cause of the occurrence in question did you find to be attributable to each of the persons found by you to have been negligent, if any?
Answer as to each of the following by stating a percentage opposite each name. The percentages assigned, if any, must total 100%.

                  ANSWER

a) William Dean Claussen    20%

b) Defendant Bullock    80%

If you have answered Issue No. 1 b) "Yes" then answer Issue No. 3; otherwise do not answer it.
You are instructed that with regards to this issue you may consider only the acts or omissions, if any, that were authorized or ratified by a person acting in a managerial or supervisory capacity on behalf of Elbar, Inc.

(Emphasis added.)

3
Did the actions or omissions, if any, of the Defendant Elbar constitute gross negligence?
ANSWER "Yes" or "No" [4]
ANSWER    YES
If you have answered Issue No. 3 "Yes" then answer Issue No. 4; otherwise do not answer it.

4
Was the gross negligence of Defendant Elbar a proximate cause of the death of William Dean Claussen?
ANSWER "Yes" or "No"
ANSWER    YES

In the verdict as originally returned, the jury did not answer special issue no. 3. After realizing issue 3 was unanswered, the trial judge made the following statement:

The Court then discovered, and this was in accordance with the instructions that were given to the Jury, reviewing the Charge as a whole, the Court is of the opinion that the instruction that was given needed to include the option that they be allowed to answer Issue No. 3, if they had answered Issue No. 1(c). And inasmuch as no objection to that instruction had been raised, the Court has indicated to Counsel that it intends to re-submit the Charge to the Jury with the instruction that they are "You are instructed to answer Issue No. 3" period. With no other elaboration whatsoever....

Thereafter, counsel for Elbar objected to the instruction arguing that the jury returned a verdict based on the original instructions and that any deviation from those instructions would be prejudicial.

---

**3.** The Court is aware that rules 271–279 of the Texas Rules of Civil Procedure refer to jury submissions as "questions." However, because the charge in this case used the term "special issues" we have retained that terminology for purposes of clarity.

**4.** This special issue was initially left unanswered by the jury although issue no. 4 was returned with an affirmative answer.

Following further deliberation, the jury answered "yes" to special issue no. 3. Elbar argues that the initial verdict was complete and was in accordance with the charge. Therefore, it is argued, the trial court was required to receive the verdict or to declare a mistrial. We disagree.

■ The trial court has broad discretion in deciding what instructions should be submitted. *Erickson v. Deayala,* 627 S.W.2d 475, 478 (Tex.App.—Corpus Christi 1981, no writ). Viewing the entire charge, we hold that the conditioning instruction was erroneous. The jury should have been instructed, "If you have answered issue no. 1(b) or (c) yes, then answer issue no. 3; otherwise, do not answer it."

■ During the charging conference, there was some confusion concerning how the instruction should read; however, the erroneous instruction was incorporated into the charge without objection. Elbar waived its right to complain about the instruction and the trial court could have deemed a finding in support of the judgment. *See Little Rock Furniture Mfg. Co. v. Dunn,* 148 Tex. 197, 204, 222 S.W.2d 985, 991 (1949); *Poe v. Hutchins,* 737 S.W.2d 574, 578 (Tex.App.—Dallas 1987, writ ref'd n.r.e.); G. HODGES & T. GUY, THE JURY CHARGE IN TEXAS CIVIL LITIGATION § 62 (Texas Practice 1988). However, because the charge was defective, the trial court was also authorized to give the jury such additional instructions as it thought proper. *See* TEX.R.CIV.P. 295.

Finding no reversible error, the judgment of the trial court is affirmed.

ROWE, J., dissents.

ROWE, Justice, dissenting.

I agree with the majority opinion in all respects except for its failure to consider on the merits Elbar's complaint about the impropriety of awarding exemplary damages to the Claussens for the wrongful death of their son. Such an award is fundamentally without support in law and should not be allowed to stand.

This is a classic case for resort to the principle of fundamental error. As the ma-

jority concedes, the Claussens, as surviving parents of William Dean Claussen, are not entitled to recover exemplary damages under the Wrongful Death Act because Article XVI § 26 of the Texas Constitution limits the right to recover exemplary damages for the wrongful death of a person to the "surviving" husband, widow [and] heirs of his or her body. Thus, the exemplary damage award in this case is in direct conflict with the public policy of Texas as declared in our state constitution. Also, the underlying facts are not in dispute, and the error is clearly discernible from the face of the record without resort to the statement of facts.

Despite the recent near-fatal restrictions placed upon the doctrine of fundamental error by our supreme court, at least two exceptions are still viable: (1) errors which directly and adversely affect the public generally as that interest is declared in the constitution of the state, *Ramsey v. Dunlop,* 146 Tex. 196, 205 S.W.2d 979, 983 (1947), and (2) lack of jurisdiction over the subject matter, *McCauley v. Consolidated Underwriters,* 157 Tex. 475, 304 S.W.2d 265, 266 (1957). The record before us straddles both of these exceptions. Further, this Court on a prior occasion, when a comparable set of facts was presented, did not hesitate in finding fundamental error. In *Smith v. Basham,* 227 S.W.2d 853, 856 (Tex.Civ.App.—Dallas 1950), *aff'd,* 149 Tex. 279, 233 S.W.2d 297 (1950), our Court characterized as fundamental error, reversible with or without assignment, the granting of a statutory penalty against the estate of a decedent on a cause of action as to which penalties for violation do not survive the death of the violator. I would follow this example and reform the judgment in this case to eliminate the award of exemplary damages to the Claussens.